**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
**WESTERN DIVISION**

| | | |
|---|---|---|
| ENEYE GLORIA GBEDEE, As Administrator of the Estate of Emmanuel Kwame Gbedee Sr., | ) | |
| Plaintiff, | ) | Case No.: 5:26-cv-250 |
| v. | ) | **COMPLAINT** |
| UBER TECHNOLOGIES, INC. AND RASIER, LLC, | ) | **Jury Trial Demanded** |
| Defendants. | ) | |

Plaintiff, Eneye Gloria Gbedee, as Administrator of the Estate of Emmanuel Kwame Gbedee Sr., by and through undersigned counsel, brings this Complaint against Defendants and alleges, on personal information and belief, as follows:

## INTRODUCTION

1. This action arises from the death of Emmanuel Kwame Gbedee Sr. ("Mr. Gbedee"), who was killed on January 11, 2025, while working as a driver for Uber Technologies, Inc. and its subsidiary, Rasier, LLC. Mr. Gbedee, a husband and father of four children, had been driving for Uber to supplement his income. On the date of his death, Mr. Gbedee accepted an Uber trip request that resulted in his murder by an Uber passenger.

2. This incident was foreseeable given Uber's documented knowledge of the risks of violence that its drivers face from passengers. Uber has long been aware of these dangers, yet has failed to implement adequate safety measures to protect drivers. A 2023 survey of 900 Uber and Lyft drivers conducted by the Solidarity Organizing Center found that 67% of drivers reported experiencing violence, harassment, or abuse on the job; 10% had been robbed or carjacked; 3% had been sexually assaulted; and 2% had been stabbed.[1]

[1] Strategic Organizing Center, *Driving Danger: How Uber and Lyft Create a Safety Crisis for Their Drivers* (Apr.

3. Plaintiff brings this action not only to seek justice for Mr. Gbedee and his family, but to hold Uber accountable for its failure to protect the very people who make its business possible.

## PARTIES

4. **Plaintiff, Eneye Gloria Gbedee** is the widow and administrator of the Estate of Emmanuel Kwame Gbedee Sr., deceased, and brings this action individually and on behalf of all heirs entitled to recover for wrongful death under North Carolina law.

5. **Defendant Uber Technologies, Inc.** ("Uber Technologies") is a for-profit Delaware corporation with its corporate headquarters, principal office, and principal place of business at 1515 3rd Street, San Francisco, California 94158. Defendant Uber Technologies can be served with process through its North Carolina registered agent, CT Corporation System.

6. **Defendant Rasier, LLC** ("Rasier") is a Delaware limited liability company. On information and belief, Rasier, LLC is a wholly owned subsidiary of Uber Technologies. Defendant Rasier maintains its principal place of business at 1515 3rd Street, San Francisco, California 94158. Rasier is one of the primary Uber entities that manages Uber's relationship with its drivers, and so its activities affect Uber drivers in all states. On information and belief, Rasier, LLC is entirely controlled by Uber Technologies, Inc. Rasier can be served with process through its North Carolina registered agent, CT Corporation System.

7. Unless otherwise specified, this Complaint refers to Defendants Uber Technologies, Inc. and Rasier, LLC collectively as "Uber."

8. Upon information and belief, Plaintiff further alleges that each corporate Defendant, acting through its officers, directors, supervisors, and managing agents, and each

2023), https://thesoc.org/wp-content/uploads/sites/342/SOC_RideshareDrivers_rpt-042023.pdf.

individual Defendant, had advance knowledge of the dangerous propensities and prior wrongful conduct of its agents and employees. Despite this knowledge, Defendants allowed such conduct to occur and continue, and thereafter authorized and ratified the wrongful conduct alleged herein.

9. Defendants are liable for the acts of each other through principles of *Respondeat superior*, agency, ostensible agency, partnership, alter-ego and other forms of vicarious liability.

10. The Uber passenger who perpetrated the murder described herein ("Uber Rider") was acting as an agent of Uber at all material times.

11. This Complaint refers to Defendant Uber Technologies, Inc. and Defendant Rasier, LLC as Defendants.

## JURISDICTION AND VENUE

12. This Court has subject matter jurisdiction under 28 U.S.C. § 1332 because there is complete diversity amongst the parties to this case, no Defendant is a citizen of the State of North Carolina, and the amount in controversy exceeds $75,000, exclusive of interests and costs.

13. Venue is appropriate in the Eastern District of North Carolina pursuant to 28 U.S.C. § 1391(b)(2) as a substantial part of the events giving rise to Plaintiff's claims occurred in Johnston County, North Carolina, which is situated in the Western Division of the Eastern District of North Carolina.

14. This Complaint was brought within all statutes of limitations and repose.

## FACTS

### Uber's Business Model

15. Uber is a multi-billion-dollar transportation company headquartered in San Francisco, California that pioneered an app-based transportation system that eventually spread through the United States and around the world. Its core business is providing transportation to the public at large through its network of drivers.

16. Uber provides an online and mobile application (the "Uber App"). The Uber App connects persons seeking transportation with persons who use their personal vehicles to provide transportation in exchange for compensation. Users request and pay for rides through the customer version of the Uber App. Drivers are notified of requested rides, which they can then accept and be compensated for by Uber through the driver version of the Uber App. Both versions of the app connect to the same website, Uber.com, which is Uber's website.

17. Anyone from the public may download either version of the Uber App for free.

18. Uber does not allow discrimination against passengers on the basis of race, color, national origin, religion, gender, gender identity, physical or mental disability, medical condition, marital status, age, or sexual orientation. Any member of the public can use Uber's services for transportation.

19. Since its founding in 2009, Uber has effectively and quickly monetized hiring regular civilians to transport passengers to destinations of their choice. But Uber concealed the inherent dangers that existed in such an arrangement, from its drivers and riders.

20. Uber's system proved convenient for the public and lucrative for the company. Uber's business model placed a driver who was trusting in Uber's reputation, and a rider about whom the driver and Uber both knew very little, in an isolated setting (a private vehicle) with limited means for the driver to escape if something went amiss.

21. To continue building this system, Uber needed to make the acquisition of drivers and riders as cheap and frictionless as possible. Anything that discouraged riders or drivers from using the service would jeopardize Uber's profits.

22. First, Uber had to change the public's attitude toward getting into a civilian-owned car by convincing drivers and passengers to share a ride with strangers. Uber did so by assuring passengers and drivers that Uber was safe: the "safest rides on the road," "a ride you can trust,"

and a service that "was created to ensure reliable access to safe rides."[2] Even today, Uber continues to maintain that "safety is a top priority."[3] This ubiquitous messaging generated reassurance that drivers and passengers could count on Uber to keep them safe. It alleviated the serious safety concerns that would otherwise make people hesitant to use Uber's services.

23. Uber successfully convinced the general public that an Uber ride is not a ride with a stranger. Instead, it is a ride operated by vetted Uber drivers, carrying pre-selected Uber riders, with trip monitoring and fare management exclusively within the Uber App. It is the illusion of a responsible corporation overseeing virtually every aspect of the ride that reassures drivers and passengers they are safe and secure when they get into an Uber.

24. Second, Uber circumvented the taxi industry's existing safety protocols by minimizing background checks, vehicle safety checks, and oversight of drivers, to quickly expand its supply of non-professional drivers to meet this demand.

25. At every step, Uber's approach to safety reflected its ambitious goals of recruiting riders and drivers with as little resistance as possible. Upon information and belief, when Uber launched its new transportation system, it did not hire any safety experts, nor did it spend a single minute or dollar thinking about how to prevent the robbery, assault, and murder of Uber drivers.

26. Uber has long been aware of the dangers its drivers face from violent passengers, including assaults, robberies, and murders.

27. Despite this knowledge, Uber has failed to implement basic safety measures to protect its drivers, such as effective passenger screening, real-time monitoring, and meaningful

---

[2] *See* Uber, Safety, https://web.archive.org/web/20140701103201/uber.com/safety (archived Jul. 2014); *see also* Uber, Safety, https://web.archive.org/web/20180224182422/https://www.uber.com/safety/ (archived Feb. 2017).

[3] Uber, Rider Safety Features, https://www.uber.com/br/en/ride/safety/rider-safety-features/ (last visited Jan. 15, 2026).

support for drivers in dangerous situations.

28. At all material times, Uber did not require any of its passengers to undergo criminal background checks to ensure the safety of drivers and other passengers who also utilize Uber's services.

29. Uber never informed drivers of the risks associated with driving for Uber. Instead, Uber continuously made vague safety representations, such as asserting: "At Uber, Safety Never Stops."

30. Uber's business model depends on a vast network of largely unprofessional drivers, whom Uber controls through its App, sets fares for, and profits from, while disclaiming responsibility for their safety.

31. To foster a system of trust and safety, Uber actively markets itself as a safe and reliable platform for both riders and drivers, but in reality, it has prioritized growth and profit over the safety of those who make its business possible.

32. Uber has long marketed its platform as a *safe and responsible transportation option for intoxicated individuals*, particularly on holidays such as New Year's Eve, when alcohol consumption and impaired driving are most prevalent. Through widespread advertising, including partnerships with grocery stores such as Albertsons Companies,[4] and joint marketing campaigns with alcohol manufacturers and local bars,[5] Uber actively encourages intoxicated patrons to rely on its service as a safe way to get home. In doing so, Uber not only induces public reliance on the safety of its rides but also knowingly increases the exposure of its drivers to intoxicated,

---

[4] Albertsons Companies, Albertsons Companies Drives Rewards Beyond the Grocery Aisle with Uber One Perks for All Loyalty Members, No Paid Subscription Required, https://www.albertsonscompanies.com/newsroom/press-releases/news-details/2025/Albertsons-Companies-Drives-Rewards-Beyond-the-Grocery-Aisle-with-Uber-One-Perks-for-All-Loyalty-Members-No-Paid-Subscription-Required/default.aspx (last visited Jan. 15, 2026).

[5] Uber, Decide to Ride, https://www.uber.com/us/en/u/reasons-to-ride/ (last visited Jan. 15, 2026).

unpredictable, and potentially violent passengers. By expressly targeting this demographic for profit, Uber assumed a heightened duty to implement and enforce reasonable safety measures to protect its drivers from the foreseeable risks associated with transporting impaired riders.

33. In 2014, Uber started charging passengers an extra $1 fee for each trip. Uber coined this fee a "Safe Rides Fee."[6] When Uber announced the "Safe Rides Fee," it told the public that the "[f]ee supports our continued efforts to ensure the safest possible platform for Uber riders and drivers, including an industry-leading background check process, regular motor vehicle checks, driver safety education, development of safety features in the app, and insurance."[7]

34. Uber collected the "Safe Rides Fee" on hundreds of millions of rides and made hundreds of millions in revenue as a result. But it never earmarked the money for improving safety or for the safety-related items it promised.

35. The true purpose of the "Safe Rides Fee" was to "add $1 of pure margin to each trip."[8] A former Uber employee admitted that Uber "boosted [its] margins saying [Uber's] rides were safer. … it was obscene."[9]

36. Uber has curated a public image of safety and superiority to public transportation and traditional taxis, as it was named for this exact reason.[10]

37. Uber has consistently touted its commitment to safety. Early on, Uber advertised its services as the "safest rides on the road" and designed ads showing children using its service. By way of example, Uber's Safety page displayed this ad:

---

[6] *See generally Philliben v. Uber Techs., Inc.*, No. 14-CV-05615-JST, ECF No. 1 (N.D. Cal. Dec. 23, 2014); *see also* Mike Isaac, *Super Pumped: The Battle for Uber* at 135 (W. W. Norton & Co. 2019).
[7] Mike Isaac, *Super Pumped: The Battle for Uber* at 135 (W. W. Norton & Co. 2019).
[8] *Id.*
[9] *Id*. at 136.
[10] *Id.* at 48-50.




38. Until 2016, Uber continued marketing its rides as being the safest rides on the road by suggesting it set stringent standards and characterizing its background checks as "gold standard" and "industry leading" (they were not).

39. In 2017, Uber agreed to pay $32.5 million to settle a class action lawsuit involving misrepresentations and omissions regarding Uber's Safe Rides Fee, safety measures, alleged expenditures, among other things.[11] Uber also agreed to pay $25 million to settle a consumer protection action filed by the County of Los Angeles and City of San Francisco. As part of the consumer protection settlement, Uber further agreed to stop using phrases such as "safest ride on the road" and describing its background checks as "gold standard."[12]

40. Following its fraud settlements, Uber continued to mislead passengers and drivers alike regarding the safety of its services. Uber advertised: "Safety and confidence behind the wheel. Our commitment to drivers" and "[S]afe rides for everyone: Whether riding in the backseat or driving up front, every part of the Uber experience is designed around your safety and

---

[11] *McKnight v. Uber Technologies, Inc.,* No. 3:14-cv-05615-JST, ECF No. 125, at 22-23, Amended Stipulation of Settlement (N.D. Cal. June 1, 2017) (Uber agreed to take significant measures as part of the 2016 Settlement and will be bound by its commitment if the Amended Settlement is approved. These measures include, but are not limited to, changes to how Uber describes its background check process, and its agreement to refrain from using statements such as "safest ride on the road," "industry-leading," and certain other statements that Plaintiffs challenge in the Consolidated Amended Complaint "[i]n any Commercial Advertising.").

[12] Mike Isaac, *Uber Settles Suit Over Driver Background Checks*, N.Y. Times (Apr. 8, 2016), https://www.nytimes.com/2016/04/08/technology/uber-settles-suit-over-driver-background-checks.html

security."[13] Uber further promised: "Drive safely with Uber."[14]

41. In 2018, Uber underscored its commitment to safety: "People matter most to the Uber experience. And it's a 2-way street between riders and drivers."[15]

42. In 2019, Uber continued assuring driver safety: "Our focus is on your safety, so you can focus on the opportunity." Uber further noted that it was "Building safer journeys for everyone." Uber's CEO, Dara Khosrowshahi, said "Helping keep people safe is a huge responsibility and one we do not take lightly."[16]

43. In 2020, Uber launched its new "Door-to-Door Safety Standard…measures [] designed to help protect the health and safety of everyone who uses our platform."[17]

44. In 2022, Uber touted its commitment to safety once again: "That's why we're committed to safety—from the creation of new standards to the development of technology with the aim of reducing incidents."[18]

45. Uber's representations aimed to create a false sense of security. Uber built low-cost, perfunctory safety measures, such as a button to call emergency responders from inside the Uber App.

46. Uber avoids taking more meaningful steps readily available to it as a sophisticated tech company with complete control over the end-to-end user experience.

47. For example, Uber has never required live camera recording in cars. For years, Uber

---

[13] Uber, Driver Safety, https://web.archive.org/web/20170723122307/https://www.uber.com/drive/safety/ (archived Jul. 2017); Uber, Safety, https://web.archive.org/web/20170723152218/https://www.uber.com/safety/ (archived Jul. 2017).

[14] Uber, Driver Safety, https://web.archive.org/web/20170723122307/https://www.uber.com/drive/safety/ (archived Jul. 2017).

[15] Uber, Safety, https://web.archive.org/web/20180531205621/https://www.uber.com/safety/ (archived May. 2018).

[16] Uber, Safety, https://web.archive.org/web/20190630220628/https://www.uber.com/us/en/safety/ (archived Jun. 2019).

[17] Uber, Safety, https://web.archive.org/web/20200707221757/https://www.uber.com/us/en/safety/ (archived Jul. 2020).

[18] Uber, Safety, https://web.archive.org/web/20220731095735/https://www.uber.com/us/en/safety/ (archived Jul. 2022).

has known that mandatory cameras (i.e., cameras the driver nor the passenger can disable during a trip) would effectively deter assault, robbery, or murder.

48. In fact, rather than implementing meaningful safety measures, Uber developed an algorithm called the "Safety Risk Assessed Dispatch" which predicted the likelihood of assault and other violent incidents between Uber drivers and Uber riders.[19]

49. What is more, Uber continued to organize rides that were identified as "high-risk" despite their algorithms' warnings.[20]

50. And worse yet, Uber still failed to warn its drivers and passengers.[21]

51. Any person with a smartphone or a device with internet access can utilize the Uber app. This means that Uber drivers may encounter millions of Uber users, who are strangers that have not been screened by Uber.

52. Uber maintained essential control over its drivers in at least the following respects:

i. At all material times, Uber has the discretion to deactivate users or prohibit their use of the app for any reason and at any time;

ii. Drivers have no input on fares charged to consumers;

iii. Uber retains control over customer-contact information;

iv. Uber controls the hours a driver works;

v. Uber requires its drivers to pick up Uber customers on the correct side of the street;

vi. Drivers who reject too many ride requests risk facing discipline, including suspension or termination; and

---

[19] Emily Steel, *Uber's Festering Sexual Assault Problem*, N.Y. Times (Aug. 6, 2025), https://www.nytimes.com/2025/08/06/business/uber-sexual-assault.html (last visited Jan. 15, 2026).
[20] *Id.*
[21] *Id.*

vii. Drivers have no input on which riders are assigned to them for a ride.

53. At all material times, Uber represented to its drivers, including Mr. Gbedee, on its website the following:[22]

i. "***Drive with confidence***" — "You deserve to be able to go wherever the opportunity is. Get there with support on the road and technology that *helps protect you* and those around you."

ii. "***Designing a safer experience***" — "The Driver app is built with technology to help you stay connected to your loved ones, the Uber team, and emergency authorities, so you can go even further."

iii. "***Your safety drives us***" — "*Safety is designed into the experience*. So you feel comfortable driving at night. So you can tell loved ones where you're going. And so you know *you have someone to turn to if anything happens*."

iv. **"*Our commitment to safety*"** — "We want you to move freely, make the most of your time, and be connected to the people and places that matter most to you. That's why *we're committed to safety*—from the creation of new standards to the development of technology with the aim of reducing incidents."

v. **"*You have our support whenever you need it*"** — "Uber support is available 24 hours a day, 7 days a week, and is handled by a team of trained safety agents. If you're in immediate danger, you should always contact authorities first."

54. Uber has aggressively lobbied for the enactment of laws and regulations that reduce its potential liability and undermine safety measures.[23] Uber spends millions annually on these

---

[22] Uber, Driver Safety, https://www.uber.com/us/en/drive/safety/?id=top-home-delivery%2Cwww.uber.com%2Fin%2Fhi%2Fcareers%2Flocations%2Cuber.com%2C0.7450495&uclick_id=5da3a85f-4293-4e78-a036-39456c287bd8 (last visited Jan. 15, 2026).

[23] *See e.g.,* Uber Technologies, Inc., LD-2 Quarterly Lobbying Report (Oct. 20, 2025), https://lda.senate.gov/filings/public/filing/2a389bf9-0523-40bb-989e-a876be3b1be3/print/ (accessed Jan. 15, 2026).

lobbying efforts.

55. Drivers, including Mr. Gbedee, reasonably rely on Uber's representations and promises regarding safety and security measures. Yet, Uber only requires background checks and other screening mechanisms of its drivers, and it has no similar safeguards for the riders.

56. By encouraging inebriated passengers to use its services while simultaneously promising safety, Uber subjects its drivers to dangerous working conditions. Uber drivers have virtually no protections to prevent or limit the occurrences of assault, robbery, or murder.

57. This puts Uber drivers in an untenable position: assume the risk of violent attacks by criminal Uber passengers or discontinue driving for Uber altogether.

58. In litigation, Uber blames the driver, even though Uber's marketing position is that Uber will keep them safe.

**The Murder**

59. On January 11, 2025, around 6:30 p.m., Emmanuel Gbedee Sr. drove his youngest daughter and the youngest of his four children, E.G., to a friend's 16th birthday party at 4704 Wake Forest Hwy, Durham, North Carolina 27703. He promised to pick her up once the event ended at 10 p.m.

60. While on his way to pick up his daughter from the party, Mr. Gbedee accepted an Uber trip that took him to 3367 Holly Grove Rd, Dunn, NC 28334.

61. Shortly thereafter, Mr. Gbedee arrived at the location and was met by a passenger who used the name "Tray'vian Trevel Brown" to order the Uber.

62. Upon information and belief, just after Mr. Gbedee began the trip, the Uber Rider brandished a gun and demanded that Mr. Gbedee turn over his wallet, possessions, and the car itself.

63. Moments later, the Uber Rider shot Mr. Gbedee twice in the head, killing him

immediately.

64. After stealing Mr. Gbedee's phone, the Uber Rider impersonated Mr. Gbedee by texting Mr. Gbedee's concerned wife to falsely reassure her that everything was fine.[24]

65. The Uber Rider abandoned the vehicle one mile north of the Uber pickup location at 2581 Holly Grove Rd, Benson, North Carolina 27504.

66. Around 7:30 a.m., police arrived at the Gbedee home to inform the family that they had found Mr. Gbedee.

**The Aftermath**

67. Mr. Gbedee was murdered while doing what he loved most: taking care of his family.

68. On March 1, 2025, the Gbedee family laid Mr. Gbedee to rest on what was meant to be a day of celebration. Mr. and Mrs. Gbedee's 30th wedding anniversary was on February 25, and months earlier, the family had planned a celebration for March 1, 2025.

69. Invitations had been sent to family and friends across the United States and around the world. Instead of gathering to honor three decades of marriage, loved ones gathered to mourn. A day intended to commemorate love and communion became a day of sorrow.

70. Thousands of community members joined the family to remember this great man, and dozens of organizations made tributes in Mr. Gbedee's honor.[25]

71. Uber's failure to warn drivers of the risks, implement adequate safety protocols, and respond appropriately to known dangers constitutes a conscious disregard for the safety of its drivers, including Mr. Gbedee.

---

[24] *See* Ex. 1 (text messages sent from the late Emmanuel Kwame Gbedee Senior's phone to Eneye Gbedee after his death).

[25] *See* Ex. 2 (showing tributes sent to Mr. Gbedee's family shortly after his death).

72. As a direct and proximate cause of Defendants' acts and omissions, Mr. Gbedee was murdered while working for Uber, which resulted in his family and his community suffering a devastating loss, emotional distress, and economic damages that are set forth more fully below.

## COUNT I

## WRONGFUL DEATH
**(Against All Defendants)**

73. Plaintiff incorporates by reference the previous allegations of the Complaint, as if set forth fully herein.

74. Defendants owed Mr. Gbedee a duty of care to provide a reasonably safe working environment and to take reasonable steps to protect him from the foreseeable criminal acts of passengers.

75. Defendants breached this duty by failing to implement and enforce adequate safety measures, failing to warn of known risks, failing to act on prior incidents of violence against drivers, and in other ways that will be proven through discovery and at trial.

76. As a direct and proximate result of Defendants' negligent acts and omissions, Mr. Gbedee was killed.

77. As a direct and proximate result of the negligence and gross negligence of Defendants, as set forth herein, Mr. Gbedee suffered conscious pain and emotional suffering.

78. As a direct and proximate result of the negligence and gross negligence of Defendants as set forth herein, the Estate of Emmanuel Kwame Gbedee Sr. has incurred funeral and burial expenses.

79. As a direct and proximate result of the negligence and gross negligence of Defendants as set forth herein, the Estate of Emmanuel Kwame Gbedee Sr. and its heirs have been deprived of his services, protection, care, assistance, net income, companionship, comfort, guidance, kindly offices and advice.

80. The Estate of Emmanuel Kwame Gbedee Sr. is entitled to recover from Defendants all damages caused by the negligence and gross negligence of Defendants, including all such damages set forth in N.C.G.S. § 28A-18-2, as determined by a jury but which in any event exceed $75,000.00.

## COUNT II

## NEGLIGENCE AND GROSS NEGLIGENCE
**(Against All Defendants)**

81. Plaintiff incorporates by reference the previous allegations of the Complaint, as if fully set forth herein.

82. By providing transportation to the general public using its application, Uber owed a duty to act with due and reasonable care towards its own drivers, including Mr. Gbedee.

83. Uber has been on notice that its riders have been committing violent crimes, such as murder, assault, and robbery of its drivers since at least 2015.

84. Uber was aware or should have been aware that some Uber riders would continue to murder, assault and rob, and/or otherwise attack their vulnerable Uber drivers.

85. Since learning of the violent acts perpetrated by its riders, Uber never adapted or improved its safety procedures in any meaningful way.

86. Uber does not require video monitoring of its riders that cannot be turned off, nor does it require face recognition to ensure the person calling the ride is in fact the rider themselves.

87. At all material times, Uber was well aware of the dangers its passengers posed, yet it still induced, and continues to induce, the public, including Mr. Gbedee, to rely on Uber as a safe workplace.

88. In doing so, Uber failed to warn drivers, including Mr. Gbedee, of the possibility of being murdered, assaulted, robbed, or otherwise attacked by an Uber rider.

89. Uber had a duty to exercise reasonable care under the circumstances.

90. Rather than exercising reasonable care under the circumstances, Uber knowingly refused to take basic safety measures to protect drivers from attacks from riders.

91. At all material times, Uber knowingly elected to not require or verify rider identities with biometric background checks.

92. Uber does not correct for false negatives created by its name-based screening procedures.

93. Uber does not provide industry-standard background checks which would provide the most comprehensive means of screening riders.

94. Uber does not invest in continuous monitoring of its riders and is not immediately alerted when one of its riders is implicated in criminal acts.

95. Uber does not have a consistent, reliable system for addressing violent acts perpetrated by its riders and continues to let dangerous criminals use Uber services to commit crimes against innocent drivers.

96. Uber has never presented itself to the public as a mere technology company or broker of transportation services. It has always advertised itself as a transportation company that provides reliable and safe rides.

97. For the above reasons and others to be proven in discovery and at trial, Uber breached its duty of reasonable care to Mr. Gbedee.

98. It was foreseeable that the above failures would result in an Uber rider committing an act of violence against and causing injury and/or death to another person, including an Uber driver like Mr. Gbedee.

99. Defendants knew or reasonably should have known that their acts and omissions were likely to result in injury, damage, or harm to others yet they recklessly, wantonly,

consciously, or intentionally disregarded and were indifferent to the rights and safety of others on the roadway, including Mr. Gbedee. Thus, the acts and omissions of Defendants were not only negligent, but also grossly negligent.

100. As a direct and proximate result of Defendants' negligent and grossly negligent acts and omissions, Mr. Gbedee was killed by the Uber Rider.

101. As a direct and proximate result of the negligence and gross negligence of Defendants, as set forth herein, Mr. Gbedee suffered conscious pain and emotional suffering.

102. As a direct and proximate result of the negligence and gross negligence of Defendants as set forth herein, the Estate of Emmanuel Kwame Gbedee Sr. has incurred funeral and burial expenses.

103. As a direct and proximate result of the negligence and gross negligence of Defendants as set forth herein, the Estate of Emmanuel Kwame Gbedee Sr. and its heirs have been deprived of his services, protection, care, assistance, net income, companionship, comfort, guidance, kindly offices and advice.

104. The Estate of Emmanuel Kwame Gbedee Sr. is entitled to recover from Defendants all damages caused by the negligence and gross negligence of Defendants, including all such damages set forth in N.C.G.S. § 28A-18-2, as determined by a jury but which in any event exceed $75,000.00.

## COUNT III

## DEFENDANTS' FAILURE TO WARN
**(Against All Defendants)**

105. Plaintiff incorporates by reference the previous allegations of the Complaint, as if fully set forth herein.

106. Uber's conduct created a risk of physical or emotional harm to its drivers, including Mr. Gbedee.

107. In operating its business, Uber knew and had reason to know that its drivers were at risk of murder, assault, and robbery by Uber's passengers since at least 2015.

108. Since then, Uber has received frequent complaints about rider misbehavior, has been notified of police investigations of riders' criminal conduct while acting within their capacity as Uber riders, and has been the subject of numerous civil suits and claims alleging the violent assault of Uber's drivers by Uber's riders.

109. Since 2022, Uber has used an algorithm to predict the likelihood of violent assaults or similar incidents to occur on rides between Uber riders and drivers.

110. Uber further advertises that it offers a service called Ride Check. In Uber's words, "[u]sing sensors and GPS data, this feature can help detect if a trip doesn't go as planned. We'll check in to make sure the driver and rider are safe and provide easy access to emergency assistance features for immediate help if needed."

111. Uber advertises: "If an incident occurs, in-app support is available around the clock. Our specialized team of safety agents are trained to handle sensitive reports and can offer support resources."

112. Despite the knowledge of the danger its enterprise created, Uber prioritized profits over driver safety and did not alert its drivers, including Mr. Gbedee, to the risk of violent assault by Uber riders.

113. In fact, Uber continued to market itself as a service that provides "safe" rides, knowing sufficient measures had not been employed to keep drivers safe from being physically assaulted.

114. Uber itself represented to its drivers that driving with Uber is safe, implying it is free of risk from murder, assault, and robbery.

115. Uber did not warn that no criminal background checks of Uber riders were

administered, nor did it warn that it sometimes allows riders to continue using Uber even after a driver reports to Uber they were violently assaulted.

116. Uber did not warn drivers that rides it organized were identified as “high-risk.”

117. Uber had reason to know that drivers would be unaware of the risk of murder, assault, and robbery by Uber riders.

118. A warning to its drivers that they were at risk of physical assault by Uber riders would have reduced the risk of harm to drivers, including Mr. Gbedee, who could have taken additional safety precautions and avoided the attack he suffered at the hands of Uber Rider.

119. As a direct and proximate result of Defendants’ negligent and grossly negligent acts and omissions, Mr. Gbedee was killed by the Uber Rider.

120. As a direct and proximate result of the negligence and gross negligence of Defendants, as set forth herein, Mr. Gbedee suffered conscious pain and emotional suffering.

121. As a direct and proximate result of the negligence and gross negligence of Defendants as set forth herein, the Estate of Emmanuel Kwame Gbedee Sr. has incurred funeral and burial expenses.

122. As a direct and proximate result of the negligence and gross negligence of Defendants as set forth herein, the Estate of Emmanuel Kwame Gbedee Sr. and its heirs have been deprived of his services, protection, care, assistance, net income, companionship, comfort, guidance, kindly offices and advice.

123. The Estate of Emmanuel Kwame Gbedee Sr. is entitled to recover from Defendants all damages caused by the negligence and gross negligence of Defendants, including all such damages set forth in N.C.G.S. § 28A-18-2, as determined by a jury but which in any event exceed $75,000.00.

## COUNT IV

## PUNITIVE DAMAGES
**(Against All Defendants)**

124. Plaintiff incorporates by reference the previous allegations of the Complaint, as if fully set forth herein.

125. The acts of Defendants described herein constitute willful and wanton disregard for the rights and safety of others on a public roadway, including but not limited to Mr. Gbedee.

126. Officers, directors and/or managers of the Uber Defendants condoned the willful and wanton conduct described herein in reckless disregard of the rights of others, including but not limited to Mr. Gbedee, giving rise to punitive damages.

127. As stated above, Uber knew that it faced an ongoing problem of criminal passengers riding with Uber and assaulting its drivers.

128. As early as 2015, Uber knew that its riders were violently assaulting drivers.

129. Since 2015, Uber has received frequent driver complaints about rider misconduct, including violent assault, robbery, and murder.

130. Since 2022, Uber has used an algorithm to predict the likelihood of violent assaults or similar incidents to occur on rides between Uber riders and drivers.

131. Uber has been notified of police investigations of the criminal conduct of riders acting within their capacity as Uber riders, and it has been the subject of numerous civil suits and claims alleging the assault, robbery, and murder of Uber's drivers by Uber's riders.

132. Nevertheless, even though Uber was fully aware of its criminal assailant problem it failed to take safety precautions to protect its drivers.

133. Even after Uber was aware some Uber riders were using Uber as an opportunity to violently assault unsuspecting drivers, Uber made the conscious decision not to implement more safeguards or thoroughly vet its riders before and after authorizing them to use the Uber app.

134. The decision not to implement more thorough and persistent background checks was driven by Uber's desire for rapid expansion and increased profits, because the more riders utilizing Uber, the more money there was to be made.

135. Prioritizing profits over safety, Uber also made the conscious decision not to warn its drivers of the risk of being violently assaulted even after it was fully aware of this risk.

136. Safety precautions such as enhanced background checks, electronic monitoring systems, warnings to drivers of the dangers of being attacked by Uber riders, and cooperation with law enforcement when a rider attacks a driver would have cost Uber money and reputational damage.

137. Because of this, Uber decided not to implement such precautions and instead continues to place its drivers at greater risk of violent assault by Uber's own riders.

138. Additional safety precautions that Uber chose not to make include but are not limited to: ongoing monitoring of Uber riders through available technology including cameras and GPS; blocking accounts created under the same IP address, from previously terminated accounts at the same IP address; a zero tolerance policy for riders who deviate from expected behavior; a zero-tolerance program for physical assault and guidelines mandating immediate account termination; creating and instituting a system encouraging driver reporting; and adequate monitoring of driver complaints by well-trained and effective customer service representatives.

139. Uber chose not to implement such precautions, nor did it warn drivers of the risk of being physically assaulted.

140. Prioritizing profits over driver safety, Uber acted, and continues to act, recklessly and in knowing and consciously disregarding of the safety of its drivers, including that of Mr. Gbedee.

141. The willful and wanton conduct of all Defendants was designed to injure Mr. Gbedee and did in fact injure Mr. Gbedee, as well as his Estate.

142. As a direct and proximate result of Defendants' outrageous, aggravated, willful, wanton or malicious conduct, Plaintiff is entitled to recover punitive damages from all Defendants under N.C. Gen. Stat. § 1D-15.

143. Plaintiff seeks and is entitled to punitive damages in the full amount allowed under the law, $250,000.00, or three times compensatory damages, whichever is greater, from each of Defendants.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays the Court enter judgment in her favor and against Defendants, jointly and severally, and award relief as follows:

1. That Plaintiff has and recovers all damages compensable under N.C.G.S 28A-18-2(b), including punitive damages from Defendants;
2. That Plaintiff has and recovers compensatory damages against all Defendants, jointly and severally, for the wrongful death of Emmanuel Kwame Gbedee Sr.;
3. For prejudgment interest from the date of the incident to the date of judgment, as provided by law;
4. For such other and further relief as this Court deems just and equitable.

**JURY DEMAND**

Plaintiff by and through counsel hereby requests a trial by jury in the above-entitled cause of action pursuant to Fed.R.Civ.P. 38(b).

Dated: April 15, 2026

Respectfully Submitted,


*/s/ Catharine E. Edwards*
Imani N. Maatuka
Texas Bar No. 24125653
Imani@maelaw.net
**MAATUKA AL-HEETI EMKES LLC**
1201 Elm Street
42nd Floor
Suite 4258
Dallas, Texas 75270
Tel.: (214) 945-0169
Fax: (217) 337-0707

Shayla Maatuka
Illinois State Bar No. 6283428
Shayla@maelaw.net
**MAATUKA AL-HEETI EMKES LLC**
2102 Windsor Place, Suite 1
Champaign, IL 61820
Tel.: (217) 337-0700
Fax: (217) 337-0707

Catharine E. Edwards
**EDWARDS BEIGHTOL LLC**
N.C. State Bar No. 52705
P.O. Box 6759
Raleigh, NC 27628
cee@eblaw.com
Phone: (919) 636-5100

*Attorneys for Plaintiff*

# *Exhibit 1*

3:21

KEG King

I'll call you back.

Friday, Jan 10, 2025 • 11:00 AM

I'll call you back.

11:00 AM

Saturday, Jan 11, 2025 • 9:57 PM

Please text me.

9:57 PM

Saturday, Jan 11, 2025 • 11:29 PM

Please text me.

RCS chat with

Sunday, Jan 12, 2025 • 4:22 AM

Text message

3:17

KEG King

Please text me.

Saturday, Jan 11, 2025 • 11:29 PM

Please text me.

RCS chat with

Sunday, Jan 12, 2025 • 4:22 AM

Where are you? Been calling you on the phone, No response

4:22 AM

Text me...

# ***Exhibit 2***

**STATE OF NORTH CAROLINA**
**OFFICE OF THE GOVERNOR**

March 1, 2025

Mrs. Eneye Gbedee
1405 Cozart St.
Durham, NC 27704

Dear Mrs. Gbedee,

I am so sorry to be sending a note of condolence rather than congratulations today on your wedding anniversary. I was deeply saddened to learn of the loss of your husband Emmanuel.

Your 30 years of marriage are a testament to your love and commitment to one another over the years. It is devastating that his senseless murder cut short what surely would have been many more years of love and happiness together.

I am sure that this is an extremely difficult time for you, especially considering how this day was meant to be one of celebration. My hope is that you find comfort in your special memories of Emmanuel as you reflect on your many wonderful years together.

Please know that you and your family are in my thoughts and prayers. May your husband's memory be a blessing.

With deepest sympathy,

Josh Stein
Governor

**Sanctuary of Praise**
**PHILADELPHIA CENTRAL CHURCH**
Tubman Boulevard, Congo Town, Monrovia, Liberia
P.O. Box 10-4067, 1000 Monrovia, 10 Liberia, West Africa
Tel.: +231886514390 Email: gharris_60@yahoo.com

***Office of the Senior Pastor***

**TRIBUTE TO THE LATE EMMANUEL KWAME GBEDEE SR**

From: Bishop George D. Harris and the Philadelphia Church Family
Date: Saturday, March 1, 2025

Scripture Reading: 1 Corinthians 15:50-57

"Now this I say, brethren, that flesh and blood cannot inherit the kingdom of God; neither doth corruption inherit incorruption. Behold, I shew you a mystery; We shall not all sleep, but we shall all be changed, in a moment, in the twinkling of an eye, at the last trump: for the trumpet shall sound, and the dead shall be raised incorruptible, and we shall be changed..."
(1 Corinthians 15:50-52).

"When the storms of life are raging, stand by me..."
These familiar words from an old hymn bring comfort as we gather today, March 1, 2025, in Charlotte, North Carolina, USA, and Monrovia, Liberia, to celebrate the life of Brother Emmanuel Kwame Gbedee Sr.
Our hearts are heavy as we reflect on the loss of a beloved husband, father, son, friend, and child of God.

Brother Emmanuel was a gentle soul, a man of faith, and a dedicated family man. He lived with integrity, love, and a deep commitment to God and his loved ones. Though he left his home expecting to return within minutes or hours, it was instead a farewell—a goodbye for now until we meet again in heaven.

At Philadelphia Central Church in Monrovia, Liberia, we deeply mourn his passing. He was not just a member but a brother in Christ, someone whose presence brought warmth and encouragement to many. He was a born-again believer, a patriotic Liberian, and a man who cherished his family.

To our dear Deaconess Eneye Gbedee, the children, and all family members, we stand with you in this season of grief. May the Lord strengthen, comfort, and uphold you by His grace.
The same God who carried Brother Emmanuel home to glory will continue to stand by you, just as the hymn reminds us.
Though our hearts ache with sorrow, we find solace in the promise of eternal life through Jesus Christ.
As the scripture declares, "Death is swallowed up in victory. O death, where is thy sting? O grave, where is thy victory?"
(1 Corinthians 15:54-55).

We will miss a great man, a great family man, a great brother, and a great friend. But we do not mourn as those without hope. We take comfort in knowing that he is now in the presence of our resurrected Lord and Savior, Jesus Christ.

May his soul rest in perfect peace.

Amen, Amen, and Amen.

+GDHarris

Bishop Dr. George D. Harris
Senior Pastor
Philadelphia Central Church

***Resolution of Respect and Remembrance***
***For the Life and Service of Emmanuel Kwame Gbedee***
***March 1, 2025***

*"Well done, good and faithful servant; you have been faithful over a few things, I will make you ruler over many things. Enter into the joy of your Lord." — Matthew 25:23*

*We, the members of The River Church, under the leadership of Bishop Ronald L. Godbee Sr. and Pastor Karla Godbee, stand together in love and reverence as we honor the life and legacy of our beloved brother and faithful servant, Emmanuel Kwame Gbedee.*

***Whereas,*** *God in His infinite wisdom has called our dear brother from labor to eternal rest, we bow in humble submission to the will of the Almighty, trusting in His promise of eternal life.*

***Whereas,*** *Emmanuel Kwame Gbedee served The River Church with unwavering dedication, embodying the heart of a servant through his love for God, his family, and his community. His life was a living testimony of faith, compassion, and leadership, touching countless lives with his kindness and grace.*

***Whereas,*** *he was a devoted husband of 30 years to his beloved wife, a loving father to Emmanuel Jr., Elmer, Joy, and Twinkle, and a steadfast friend to many, we recognize the profound impact he made as a pillar of strength, wisdom, and love in his home and community.*

***Whereas,*** *Emmanuel's influence extended beyond the walls of the church, serving as a beacon of hope, a community leader, and a friend to all who knew him, his legacy of selfless service and genuine care will continue to inspire us for generations to come.*

*Therefore, be it resolved, that we, The River Church family, express our deepest sympathy to the Gbedee family. We share in your sorrow, yet we rejoice in the assurance that Emmanuel rests in the presence of the Lord, free from pain and filled with eternal peace.*

*Be it further resolved, that a copy of this resolution be given to the family as a testament to our love, support, and that it be recorded in the archives of The River Church in lasting memory of our beloved brother in Christ.*

*Humbly submitted on this 1st day of March, 2025, by:*

*The River Church Family*
*Bishop Ronald L. Godbee Sr., Lead Pastor*
*Pastor Karla Godbee*

*May the grace and peace of God be your comfort now and always.*

*With Love and Prayers,*
*The River Church Family*

*BISHOP RONALD L. GODBEE SR.*
*LEAD PASTOR OF THE RIVER CHURCH*
*PRESIDING PRELATE OF THE RIVER INTERNATIONAL FELLOWSHIP*

# TRIBUTE

## TRIBUTE FOR OUR LATE BOSS EMMANUEL K. GBEDEE Sr.

From the Project Implementation unit (PIU)-Robert's International Airport Road Upgrading Project, Ministry of Public Works (MPW), Department of Technical services.

*In memory of a boss who was more than a leader; you were a mentor, a friend, and a guiding light. Your guidance, wisdom, and unwavering support have left an indelible mark on our team, shaping the way we work and interact with each other." Your visionary leadership and tireless support not only shaped our careers but also deeply influenced who we have become as professionals. Your legacy of innovation and excellence will continue to inspire us, guiding our decisions and actions in the work we do."

* "You led by example, demonstrating integrity, compassion, and a relentless commitment to excellence. Your approach to leadership taught us invaluable lessons about resilience, dedication, and the power of a positive attitude."

* "Thank you for believing in us, even when we doubted ourselves. Your confidence and encouragement fostered a culture of growth, innovation, and success, pushing us to exceed our own expectations."



REST WELL

TRIBUTE

FOR OUR LATE BOSS EMMANUEL K. GBEDEE Sr.

# T R I B U T E

**FOR OUR LATE BOSS EMMANUEL K. GBEDEE Sr.**

* “Your innovative spirit and dedication to excellence were contagious, pushing us all to achieve more than we thought possible. Your legacy of ambition and drive will live on in our work, inspiring future generations.”

* “You were not just our boss but the cornerstone of our professional family. Your presence will be profoundly missed, but the foundation you built and the values you instilled in us will endure.”

* “In your memory, we pledge to uphold the values and principles you instilled in us* “Gone too soon, but your visionary leadership and compassionate approach to management will forever be a light vessel for us, sleep well boss ..may light prepetual shine upon you. May your soul and all faithful souls rest in the mercy of God.

* “You were not just our boss but the cornerstone of our professional family. Your presence will be profoundly missed, but the foundation you built and the values you instilled in us will endure.”

* “In your memory, we pledge to uphold the values and principles you instilled in us* “Gone too soon, but your visionary leadership and compassionate approach to management will forever be a light vessel for us, sleep well boss ..may light prepetual shine upon you. May your soul and all faithful souls rest in the mercy of God.



REST WELL